453 So.2d 578 (1984)
Milton E. QUATTLEBAUM
v.
HY-REACH EQUIPMENT INC., Et. Al.
Don A. INGRAM
v.
HY-REACH EQUIPMENT, Et. Al.
Nos. 83 CA 0713, 83 CA 0714.
Court of Appeal of Louisiana, First Circuit.
May 30, 1984.
Writs Denied October 26, 1984.
*580 Robert F. Kennon, Jr., Baton Rouge, for Milton E. Quattlebaum.
Marvin F. Gahagan, Natchitoches, for Don A. Ingram.
Gerald L. Walter Jr. and Vincent P. Fornias, Baton Rouge, for J.L.G. Industries Inc. and Hartford Acc. & Indem.
Paul Marks, Jr., Baton Rouge, for Hy-Reach Equipment Inc.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
These are suits for damages in tort asserting causes of action in strict (products) liability. The plaintiffs, Milton E. Quattlebaum and Don A. Ingram, contend that they were injured when a self-propelled aerial work platform overturned. The platform was manufactured by JLG Industries, Inc. (JLG), owned by Hy-Reach Equipment, Inc. (Hy-Reach) and leased by plaintiffs' employer, Eltek, Inc. (Eltek). The platform was transported to the Eltek jobsite by Nichols Construction Company, Inc. (Nichols). The liability insurer of Hy-Reach was United States Fidelity and Guaranty Company (USF & G) and that of JLG was Hartford Accident and Indemnity Company (Hartford).
USF & G, in its capacity as workmen's compensation insurer of Eltek, intervened in both suits seeking reimbursement of workmen's compensation and medical benefits paid and to be paid by it. Marlene Quattlebaum intervened in the Quattlebaum suit claiming a portion of the recovery sought by her former husband. JLG filed third party demands against Hy-Reach, USF & G and Nichols in both suits. Hy-Reach and USF & G filed third party demands against Eltek in both suits.[1]
Prior to trial, Quattlebaum and Ingram consummated settlement agreements with Hy-Reach, USF & G and Nichols. Quattlebaum received $846,560.74 and Ingram received $449,250.26. Pursuant to the settlement agreements, Hy-Reach and USF & G dismissed their third party demands against Eltek and USF & G dismissed its interventions. Hy-Reach and USF & G then filed a third party demand against Quattlebaum pursuant to the settlement agreement for indemnification in the event there was judgment in favor of Quattlebaum on his main demand and in favor of JLG on its third party demand.
Quattlebaum and Ingram then proceeded to trial against JLG and Hartford. The district court rendered judgment in favor of JLG and Hartford and dismissed the plaintiffs' suits. These suspensive appeals followed.

FACTS
In 1969, Fulton Industries, Inc., later succeeded by JLG, commenced developing and designing a new type of industrial machine known as a mobile aerial work platform. This machine combined the extending boom features of a mobile hydraulic crane with the capacity to transport workers in a basket or platform to elevated heights. The first models manufactured in 1970 had booms which ascended to heights of 27 and 40 feet. Stability for these models was provided by a counterbalance design (adding weight to the base of the machine). In 1971, a model capable of reaching heights of 60 feet was designed, *581 manufactured and called the "JLG Model 60" (JLG-60). This model achieved stability with a system of outriggers which would enlarge the surface area of the base of the machine when extended. The outrigger design had been used previously in stabilizing mobile hydraulic cranes as crane booms got longer. This design contemplated that the outriggers would be fully extended before the boom was extended to insure stability and safe operation of the machine.
In the process of designing the JLG-60, a field study was conducted. This study indicated that the possibility existed that the machine would be operated without the outriggers extended. The original design of the JLG-60 provided for a placard to be located on the boom within sight of the operator which gave (among others) the following warning:
Outriggers must be set at all times for all operations. Machine must be level, with each outrigger set on firm footing.
After the machine was marketed, JLG received reports from dealers that machines were being used without properly setting the outriggers. Because of this, JLG sent a letter dated March 12, 1973, to all dealers instructing that under no circumstances should the machine be used without setting all four outriggers to prevent any possible tipping of the machine.
In 1975, JLG manufactured a JLG-60 bearing Serial No. 723985 which was sold to Hy-Reach on January 16, 1976. Hy-Reach was in the equipment rental business and had about 20 or 30 JLG-60s.
Pursuant to industry standards, manufacturers, such as JLG, are required to print and make available to dealers, such as Hy-Reach, a manual of operations, maintenance and parts. The copy of the manual filed in the record is dated August 30,1974, and was revised on February 1, 1977. At page 1-5 of this manual in Section 1 entitled "SAFETY PRECAUTIONS" appears the following:
OUTRIGGER BEAMS MUST BE FULLY EXTENDED AND ALL JACKS SET ON FIRM SURFACE, WITH MACHINE LEVELED, BEFORE ANY BOOM OPERATION IS PERMITTED.
On Page 3-10 of the manual in Section 3 on Operating Information appears the following warning:
ASSURE THAT OUTRIGGER BEAMS ARE FULLY EXTENDED AND JACKS ARE FIRMLY POSITIONED PRIOR TO ANY BOOM OPERATIONS.
Copies of this manual were made available to Hy-Reach.
JLG also prepared a pocket-sized handbook which essentially contained the facts in the operations section of the manual. This handbook was designed to be utilized by users of the machine. The first issue of the handbook came out in September of 1976. The evidence shows that 50 copies of the handbook were sent by JLG to Hy-Reach on November 17, 1976. The handbook was revised on June 1, 1977. The evidence shows that 200 copies of the handbook were shipped by JLG to Hy-Reach on November 15, 1977. The final revision of the handbook was made on May 1, 1978.[2] On the inside flap of the handbook appears the following:
CAPACITIES AND STABILIZATION.
Raising boom above horizontal and/or extension of boom beyond retracted position with or without any load in platform, is based on the following criteria:
. . . . .
4. Outrigger machineoutriggers shall be fully extended and jack cylinders set, as required, to level machine. Use blocking if soil conditions require.
On page 14 of the handbook in a section entitled "OUTRIGGER CONTROLS" appears the following:

WARNING
DO NOT SET OUTRIGGERS ON TERRAIN THAT COULD CAUSE THE MACHINE TO TIP DURING BOOM OPERATIONS. DO NOT OPERATE THE BOOM UNTIL MACHINE IS STABLE AND LEVEL WITH OUTRIGGER *582 BEAMS FULLY EXTENDED AND JACKS SET ON A FIRM SURFACE. USE SHORING ON SOFT SURFACE.
On page 32 of the handbook in a section marked "operation" appears the following:
IF APPLICABLE, ENSURE THAT
EXTENDING AXLES OR OUTRIGGERS
ARE COMPLETELY SET BEFORE COMMENCING BOOM OPERATIONS
Joseph Sheridan, the operator trainer for Hy-Reach, testified that Hy-Reach tried to make sure that users of the JLG-60 received an operator's handbook. Hy-Reach attempted to get the handbook to the user in a number of ways. First, the handbook was sealed in a plastic bag and strapped to the machine around the control box area. Second, Hy-Reach requested that the driver delivering the machine give a handbook to one of the operators. Third, handbooks were handed out to people in the field. The operations manual was not delivered to users. Sheridan testified that it was unnecessary to deliver the manual to users because only the operation section would be useful and this information was covered in the handbook.
On April 4, 1977, JLG issued a field service change letter to all dealers. This letter had "SAFETY RELATEDURGENT ACTION REQUIRED" coded in red as a heading. One of the field changes called for the installation of the following outrigger warning placard:

Three of these placards were provided for each JLG-60 at no cost to the dealers. These placards were to be installed immediately upon receipt.
On February 17, 1978, JLG sent a field service change letter to all dealers containing the following:
SUBJECT: Installation of Outrigger Interlock Circuit.
PURPOSE: Provide an electrical circuit to limit boom function until the outriggers are securely set in accordance with current production standards.
REASON: Reports from the field indicate some personnel are ignoring warnings posted on the machine, in the safety and operation handbook, and the operating section of the manual. This circuit change will reinforce the warning by not permitting boom elevation above horizontal nor telescoping out until outriggers are set.
DATE TO BE ACCOMPLISHED: Immediately upon receipt of this service change and parts.
The words "SAFETY CHANGE REQUIRED" were color coded red across the first page of the letter. The records of JLG indicate that Hy-Reach ordered an interlock kit which was shipped on July 31, 1978. However, Joseph Sheridan testified that four or five interlock systems were installed on Hy-Reach's machines.
On September 29, 1978, JLG sent a field service change letter to all dealers that an alarm system should be installed on all JLG-60s which did not have outrigger interlock circuits. This letter provided in pertinent part as follows:
MODELS AFFECTED: 60 with outriggers, prior to S/N 741217, not having outrigger interlock circuits.
SUBJECT: Installation of an outriggers not set alarm.
PURPOSE: To provide a parts listing, installation procedure, and functional check procedure for alerting machine users that a potential hazard exists if outriggers are not extended and lowered.

*583 REASON: Reports and incidents from the field indicate some personnel are ignoring warnings posted on the machine, in the safety and operation handbook, and the operating section of the manual. This electrical circuit will alert users to return the boom to the stowed position until all outrigger full extension is assured.
DATE TO BE ACCOMPLISHED: Upon receipt of this service change and parts at dealer/customer discretion and expense.
The records of JLG indicate that Hy-Reach ordered eleven alarm warning kits for installation on their machines. In particular, an alarm warning kit was ordered for machine No. 723985 on December 7, 1978. These alarm warning kits were furnished to Hy-Reach at no charge. Joseph Sheridan testified that only one alarm warning kit was installed on a Hy-Reach machine. Included in the alarm warning kits was an additional warning placard for placement on the machines which provided as follows:

Hy-Reach leased JLG-60, Serial No. 723985, to Eltek on August 10, 1979. On that same day, Nichols delivered the machine to the Big Cajun No. 2 power plant jobsite located near New Roads in Pointe Coupee Parish, Louisiana. Present on the site when the machine was delivered were Morgan Vosburg (foreman for Eltek), Archie Girlinghouse (temporary foreman for Eltek on the day of the accident), Joseph Dietrich (electrical apprentice for Eltek) and Don Ingram (electrician for Eltek). A search was conducted for an operating or instruction manual for the machine, but none were found. No user handbooks were made available by Hy-Reach. Girlinghouse attempted to extend the outriggers but was unsuccessful. He assumed that the outriggers did not work and drove the machine off of the truck. Girlinghouse and Ingram then proceeded to use the machine to do electrical work on two 60 foot towers under construction.
On August 11, 1979, a skeleton crew composed of Girlinghouse, Quattlebaum and Ingram was engaged in running lightning arrester cable on the inside ceiling of a cooling tower. Girlinghouse was the temporary foreman for that day. Girlinghouse discussed with Quattlebaum the operations of the JLG-60. Quattlebaum noticed the outriggers, but Girlinghouse explained that he could not get them to work and did not think that the failure to use them posed any danger. Quattlebaum and Ingram used the machine to install the lightning arrester cable while Girlinghouse supervised the work. The machine was used continuously from 7:15 a.m. until the accident occurred. Throughout this time, the outriggers were never extended. At 3:30 p.m. when Ingram and Quattlebaum were descending to take a break and pick up material, the machine tipped over causing the basket to fall 30-40 feet. Quattlebaum and Ingram suffered severe personal injuries.
The accident machine did not have either the interlock or alarm safety device installed. Sheridan testified that he did not consider such installation mandatory. There is conflicting testimony about whether the original design warning placard was on the boom of the accident machine. The district court found as a fact that it was. We have reviewed the testimony and this finding is not clearly wrong. None of the warning placards subsequently furnished by JLG were placed on the accident machine by Hy-Reach.

PRODUCTS LIABILITY LAW
The foundation case in Louisiana products liability law is Weber v. Fidelity & Casualty Insurance Company of New York, 259 La. 599, 250 So.2d 754, 755-756 *584 (1971) wherein the Louisiana Supreme Court observed as follows:
A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect.
. . . . .
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.
The "normal use" of a product is its foreseeable use and may include something broader than use exactly in accordance with a manufacturer's instructions. Pawlak v. Brown, 430 So.2d 1346 (La.App. 3rd Cir.1983), writ denied, 439 So.2d 1072 (La. 1983).[3]
However, in Chappuis v. Sears Roebuck and Company, 358 So.2d 926 (La.1978), it was held that a manufacturer's product liability duty (standard of care) was established by Title VII of the Louisiana Civil Code on sales (and particularly Chapter 6 thereof defining the obligation of the seller La.C.C. arts. 2474-2548). The court then observed that, although the standard of care is fixed by the civil code provisions on sales, the liability of the manufacturer is fixed by La.C.C. art. 2315. The court observed that there are many products which become dangerous for normal use in certain conditions and held that "when the danger is known to the manufacturer and cannot justifiably be expected to be within the knowledge of users generally, the manufacturer must take reasonable steps to warn the user." Chappuis, 358 So.2d at 930. (See discussion of Chappuis in W. Crawford, Work of Appellate Courts 1977-1978: Torts, 39 La.L.Rev. 687-693 [1979]).
In Hunt v. City Stores, Inc., 387 So.2d 585, 589 (La.1980), the court followed the Weber rule and characterized it as "a rule of strict liability for manufacturers of defective products". The court found that the product (escalator) presented an unreasonable risk of harm in normal use which could have been anticipated by the manufacturer and held that because no warning of the defect was given that the manufacturer was liable for the resulting injury. The court observed that the risk of harm was known to the manufacturer but was not obvious to the public, and despite knowledge of the risk, the manufacturer did not warn of the hazard.
In Philippe v. Browning Arms Company, 395 So.2d 310 (La.1981) (on rehearing), the court observed that, while La.C.C. arts. 2315 and 2316 are the fountainhead of tort responsibility, the applicable standard of conduct is determined by consulting the many codal articles, statutes and laws which provide for certain responsibilities according to the person involved or to the relationship or activities involved. The standard of care owed by a seller or manufacturer of a thing to a purchaser[4] of the thing is governed by the codal articles *585 on sales as applied through La.C.C. art. 2315. A purchaser of a defective product may proceed either in tort or contract (redhibitory action) because the manufacturer's act of delivering a defective thing gives rise to delictual, as well as contractual, liability. See also Storey v. Lambert's Limbs & Braces, Inc., 426 So.2d 676 (La. App. 1st Cir.1982), writ denied, 433 So.2d 152 (La.1983).
In DeBattista v. Argonaut-Southwest Insurance Company, 403 So.2d 26 (La.1981), the court held that the word "fault" found in La.C.C. art. 2315 is defined for purposes of products liability in Weber. The words "unreasonably dangerous" were included in the definition of fault to prevent manufacturers from becoming insurers of their own products and mean simply that the article which injured a plaintiff was dangerous to an extent beyond which would be contemplated by an ordinary consumer. The liability of the manufacturer of a product is not governed by the law of contractual warranties but by the law of strict liability in tort. Rules defining and governing warranties which were developed to meet the needs of commercial transactions cannot properly be invoked to supersede Civil Code Article 2315 which serves the much broader purpose of governing the liability of a manufacturer or processor to those injured by his defective products.
In Hebert v. Brazzel, 403 So.2d 1242 (La.1981), the court adopted the Weber statement of the law and observed that a product is unreasonably dangerous (defective) when it is dangerous to an extent beyond that which would be contemplated by an ordinary consumer or user. The plaintiffs presented no evidence that an ordinary user would fail to contemplate the danger involved in opening a valve with a wrench, and the trier of fact could reasonably conclude that an ordinary oilfield worker would appreciate the danger involved in greatly multiplying the torque to a valve stem by turning it with a 24" stillson wrench. The court further held that a manufacturer must give warning of any danger inherent in his product's normal use which is not within the knowledge of an ordinary user. It then found that a reasonable trier of fact could conclude that the danger of breaking the valve stem with a large wrench due to excessive torque was obvious to an ordinary worker. (Implicit in this holding is that where there is an obvious danger there is no duty to warn.)
In Kent v. Gulf States Utilities Company, 418 So.2d 493 (La.1982), the court observed that the word "fault" in La.C.C. art. 2315 contemplated three types of liability: absolute, strict and negligent. The distinction between strict liability and negligent liability is that the claimant in a strict liability case is relieved of proving that the defendant knew or should have known of the unreasonable risk (defect) involved. In 418 So.2d at 498 n. 6, the court observed as follows:
In products liability cases, the manufacturer is presumed to know the dangerous propensities of its product and is strictly liable for injuries resulting from the product's unreasonable risk of injury in normal use. The claimant nevertheless must prove that the product presented an unreasonable risk of injury in normal use (regardless of the manufacturer's knowledge), thus in effect proving the manufacturer was negligent in placing the product in commerce with (presumed) knowledge of the danger.

Finally, in Andries v. General Motors Corporation, Delco Batteries Division, 444 So.2d 1180, 1183 (La.1983), appears the following:
The trial court refused the requested special instruction, having already included the following in the court's instructions, a copy of which was provided to counsel prior to trial:
`A manufacturer of a product must give an adequate warning of any danger inherent in any product made by him or in its use which he knows or should know, and which the user of the product would not ordinarily discover. The warning should be such that if followed, it would make the product *586 safe for users. To comply with this duty, the manufacturer must appropriately label the product, giving due consideration to the likelihood of accident and the seriousness of the consequences from failure to label it to warn of any dangers that are inherent in it and its use or that may arise from improper handling or use of the product. However, the duty of a manufacturer to warn goes only to those dangers which are not obvious. A manufacturer is not compelled to warn knowledgeable purchasers of the dangers of which they know or should be aware.'
We conclude that the trial judge's instruction on adequacy of warning was a complete and correct statement of the law, which included the substance of the requested instruction.
See also Lovell v. Earl Grissmer Company, Inc., 422 So.2d 1344 (La.App. 1st Cir. 1982), writ denied, 427 So.2d 871 (La.1983).
In a strict products liability case, the plaintiff bears the burden of proving the essential elements of his cause of action. Lytell v. Goodyear Tire & Rubber Co., 439 So.2d 542 (La.App. 1st Cir.1983).

CONTENTIONS OF APPELLANTS AND HOLDING OF DISTRICT COURT
Quattlebaum and Ingram contend that the JLG-60 was unreasonably dangerous in normal use (defective) because it was foreseeable that the machine would be used without its outriggers extended, that it was likely the machine would turn over if it was operated without the outriggers extended, that it was defective in design because it did not have appropriate safety devices and that appellants were not adequately warned and instructed about the danger of using the machine without the outriggers extended. The district court found as matters of fact that the machine was not defective and that the accident was caused by the negligence of Hy-Reach. The district court specifically found that Hy-Reach disregarded the warnings sent by JLG, failed to deliver an operations manual when the machine was leased to Eltek and did not install the alarm or interlock safety devices. An appellate court should not disturb a factual determination of the trier of fact unless it is clearly wrong considering all the evidence. Hebert v. Brazzel, 403 So.2d at 1244.

ADEQUACY OF WARNINGS
Even if we were to assume for purposes of argument that the failure originally to include the alarm or interlock devices on the JLG-60s was a defect in design and that it was foreseeable that the machine would be used in the field without the outriggers extended, the plaintiffs still cannot prevail in this action. As indicated in the above jurisprudence, if a product has dangerous propensities (which a manufacturer is presumed to know) that render it unreasonably dangerous (defective) to normal (foreseeable) use, the manufacturer is liable if it fails to give a warning adequate to apprise the user of the specific risk of harm which may be encountered by the user during the use of the product.[5]Smith v. Formica Corporation, 439 So.2d 1194 (La.App. 1st Cir.1983). An adequate warning is one which, if followed, would make the product safe for the user, that is, had the injured person complied with the warning, there would have been no accident. Cf. Benoit v. Ryan Chevrolet, 428 So.2d 489, 493 n. 8 (La.App. 2nd Cir.1982). The warning must be given in such a manner that it can reasonably be brought to the attention of the user, such as placing it on the container in which the product comes, placing it on the product itself or, where appropriate, providing an instruction or operation manual. See, for example, Broussard v. Continental Oil Company, 433 So.2d 354 (La.App. 3rd Cir.1983), writ denied, 440 So.2d 726 (La.1983); Cobb v. Insured Lloyds, 387 So.2d 13 (La.App. 3rd Cir.1980), writ denied, 394 So.2d 615 (La. 1980).
*587 When originally designed, the machine had a placard on its boom within sight of the operator which warned that the outriggers must be set at all times for all operations. In March of 1973, JLG sent a letter to all of its dealers instructing that under no circumstances should the machine be used without setting all four outriggers to prevent any possible tipping of the machine. By letter dated April 4, 1977, JLG advised all of its dealers to place three more warning placards about the outriggers on each machine and provided the placards at no cost to the dealers. By letter dated February 17, 1978, JLG advised all dealers that interlock devices should be installed on the machines to preclude operation of the boom if the outriggers were not extended. Subsequently, at least one interlock device was furnished to Hy-Reach at no cost. By letter dated September 29, 1978, JLG advised all dealers that an alarm system should be installed on all machines that did not have the interlock device to warn if the boom was moved without setting the outriggers. Hy-Reach secured eleven alarm kits from JLG at no cost. In the alarm warning kits, JLG provided an additional warning plate advising that if the warning alarm sounded the boom should be restored to the stowed position and the outriggers should be set. JLG provided Hy-Reach with operation manuals and handbooks for use by their customers. The operational manual contained two warnings concerning operation of the boom without setting the outriggers, and the handbook had three such warnings. It is difficult to conceive of what additional warnings JLG could have given under the facts and circumstances of this case.
If Hy-Reach had complied with the warnings given by JLG, this accident could not have happened. Hy-Reach, however, failed to heed the warnings, failed to install the safety devices and failed to warn the users of its equipment. The record does not reflect that JLG had knowledge that Hy-Reach was ignoring the warnings. The warnings given by JLG were adequate and relieved it of liability.
This case is similar to Nishida v. E.I. Du Pont De Nemours & Company, 245 F.2d 768 (5th Cir.1957). In Nishida, a solvent manufactured by Du Pont was used by a second manufacturer to extract oil from soybeans. The soybean meal that remained after the extraction was then sold for cattle feed. Du Pont learned that its solvent might be associated with a disease in cattle which had eaten the soybean meal. Du Pont sent a letter to the second manufacturer warning that the soybean meal should not be sold as cattle feed. The second manufacturer disregarded the letter and continued to sell the soybean meal. The court held that Du Pont satisfied its duty to warn the second manufacturer and that the action of the second manufacturer of selling the cattle feed despite the warning constituted an intervening cause and relieved Du Pont of responsibility.[6] The case of Thomasson v. A.K. Durnin Chrysler-Plymouth, Inc., 399 So.2d 1205 (La. App. 1st Cir.1981), cited by the plaintiffs, is factually distinguishable from the instant case. In Thomasson, although the manufacturer advised the dealer that a group of automobiles had defective control arm assemblies, no warning was given to either the dealer or owner (Thomasson) about the particular vehicle because it was not included on the computer printout sent to the dealer. In the instant case, there are extensive and numerous warnings from the manufacturer directly to the owner.

DUTY TO PROVIDE SAFETY DEVICES
Even if we were to assume that the machine was defective and the defect could have been remedied by the installation of either the alarm or interlock safety devices, the plaintiffs cannot prevail. After JLG learned that machines were being used without extending the outriggers, it *588 advised the owner of the accident machine (Hy-Reach) more than one year in advance of the accident that these safety devices were available and would be furnished upon request. The records of JLG indicate that Hy-Reach ordered at least one interlock device. Sheridan testified that Hy-Reach secured four or five interlock devices. The records of JLG show that Hy-Reach ordered eleven alarm devices. This safety equipment was provided to JLG without cost and with instructions for proper installation. JLG also provided additional warning placards to Hy-Reach which would warn Hy-Reach's customers of the danger of using the machine without the outriggers extended. These warning placards were furnished without cost. JLG also furnished operational manuals and handbooks containing appropriate warnings for use by Hy-Reach's customers. There is no evidence in the record to indicate that JLG had knowledge that Hy-Reach was not utilizing the safety equipment, posting the warning placards or furnishing the manuals or handbooks. Under these facts and circumstances, even if the machine was defective by not having the appropriate safety devices, JLG complied with its duty to make these safety devices available to Hy-Reach. See K. Karnezis, Products Liability: Manufacturer's or Seller's Obligation to Supply or Recommend Available Safety Accessories in Connection with Industrial Machinery or Equipment, 99 ALR 3rd 693 (1980).
This case is similar to Ford Motor Co. v. Wagoner, 183 Tenn. 392, 192 S.W.2d 840 (1946). In Wagoner, a Ford dealer sold a Ford automobile to one of its salesmen. Ford learned when that model car was subjected to a severe jolt, the hood latch would sometime come loose causing the hood to rise and obstruct the vision of the driver. Ford immediately distributed to all of its dealers an auxiliary hood latch with instructions to install these latches on all cars of that model without charge. The dealer tendered one of the safety latches to the salesman and informed him about it, but he declined to accept it because he did not regard it as necessary. The salesman subsequently severed his connection with the dealer and later sold the automobile to a third person named Baxendale. A friend of Baxendale was driving the vehicle when the hood rose up, blocked her vision and an accident resulted. The Supreme Court of Tennessee ruled that Ford was not liable because of the intervening conscious acts of the salesman. The case of Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972), cited by the plaintiffs, is factually distinguishable from the instant case. In Bexiga, a manufacturer built a punch press with no safety devices of any kind except a guard over the flywheel. The press was sold to the plaintiff's employer, and the plaintiff subsequently was injured by the defective press. The manufacturer provided no warnings to the employer or employee and did not furnish any additional safety devices.

DECREE
For the foregoing reasons, the judgment of the trial court is correct and is affirmed at the appellants' costs.
AFFIRMED.
NOTES
[1] Hy-Reach and USF & G did not file third party demands against JLG and its insurer.
[2] The record does not reflect if or when copies of this revision were furnished to Hy-Reach.
[3] The meaning of "normal use" in a products liability tort action is different from the meaning of "intended use" found in the redhibitory action. Benoit v. Ryan Chevrolet, 428 So.2d 489 (La.App. 2nd Cir.1982).
[4] The Louisiana Supreme Court has not yet held that the redhibitory action is available to a person injured by a defective product which he did not purchase. Cartwright v. Chrysler Corporation, 255 La. 597, 232 So.2d 285 (1970); Sciacca v. Polizzi, 394 So.2d 1319 (La.App. 1st Cir.1981), rev'd on other grounds, 403 So.2d 728 (La.1981); Doughty v. General Motors Corporation, 303 So.2d 202 (La.App. 4th Cir.1974); W. Crawford, Developments in the Law 1980-1981: Torts, 42 La.L.Rev. 450-453 (1982); D. Robertson, Manufacturers' Liability for Defective Products in Louisiana Law, 50 Tul.L.Rev. 50, 87 at n. 196, 100-103 (1975).
[5] JLG argues that the danger in operating the machine without the outriggers extended is obvious, but we will assume that it was not for purposes of this discussion.
[6] We specifically do not pass on the question of whether or not the intervening cause defense of negligent liability is equivalent to the third person fault defense of strict liability. Loescher v. Parr, 324 So.2d 441 (La.1975); Reeves v. Louisiana and Arkansas Railway Company, 282 So.2d 503 (La.1973).