ARMSTRONG, Judge.
In this products liability case plaintiff Linda Ingram filed suit individually and on behalf of her two children against Caterpillar Tractor Company (“Caterpillar”) and Boyce Machinery Corporation (“Boyce”). In that petition plaintiff made the following allegations: that Caterpillar manufactured a forklift operated by Linda Ingram’s husband, William Charles Ingram; that the design of the forklift was defective because it failed to provide safety doors or rails, safety belts or straps, or a proper suspension system to prevent a flipover; that Caterpillar failed to take precautions or provide alternatives to insure occupant safety when it was foreseeable that the forklift could' flip over; that Caterpillar failed to warn the forklift operators of the defect; and as a result the defect caused Mr. Ingram’s death. Boyce was sued as the distributor of the forklift.
A jury trial began on July 17, 1985. Following presentation of the plaintiff’s case the trial court granted Boyce’s motion for a directed verdict and dismissed it from the case. After presentation of Caterpillar’s defense the jury retired and returned the following verdict in answer to interrogatories:
1. Did the death of William Ingram result from a defective condition in the forklift manufactured by Caterpillar? Yes.
2. Did the defective condition make the Caterpillar forklift unreasonably dangerous to normal use? Yes.
3. Did the defective condition exist at the time the forklift left the control of Caterpillar? Yes.
4.
What amount of money do you think would compensate plaintiffs for the death of William C. Ingram? $1,175,-000.00
5.
Do you find negligence on the part of William C. Ingram, which contributed to his fatal injuries? Yes_No x
6.
What percentage of fault do you attribute to the decedent William C. Ingram? 0%
Defendant Caterpillar appeals from that verdict.
Appellant claims that the plaintiff did not prove that the forklift was defective; that the damages awarded were excessive; that plaintiff’s counsel improperly appealed to the sympathy, passions and prejudice of the jury; that the trial court improperly admitted testimony regarding other forklift accidents; that the trial court improperly allowed evidence of post-accident design changes; and that the trial court gave erroneous instructions to the jury on the issue of comparative negligence.
The test to be applied by an appellate court in reviewing a decision of the trial court has been set forth clearly and concisely in Canter v. Koehring Co., 283 So.2d 716 (La.1973) as follows:
When there is evidence before the trier of fact which, upon its reasonable evalúa *743 tion of credibility, furnishes a reasonable factual basis for the trial court’s finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
Id. at 724. When the trial court judgment is based on a jury verdict we are limited in our scope of review to the question of whether there is evidence in the record which furnishes a reasonable factual basis for that verdict. Jackson v. Watson, 360 So.2d 582 (La.App. 4th Cir.1978). Since the evidence in this case is quite extensive, a review of that evidence and the pertinent testimony is necessary.
William Ingram worked as an electric forklift operator at the Kaiser Aluminum plant in Chalmette, Louisiana. On September 27, 1980 Ingram was manuevering a Caterpillar M-80 forklift down a paved slightly inclined ramp. He was moving a large coil of aluminum wire, which was either placed on top of the forks or hung from the forks. As he reached the end of the ramp the forklift turned over on its side and Ingram was crushed by the overhead guard.[1] Ingram died almost instantaneously.
There is conflicting testimony regarding what happened to the forklift as Ingram reached the bottom of the ramp. Photographic evidence shows that to the left of the ramp as it levels off, is a short round post with a truck crossing sign attached to it. The post was embedded in a cement mound, the apex of which appeared to be a several inches higher than the surrounding street.
Lawrence P. Lawson Jr., a fellow worker at the Kaiser plant testified that he witnessed the accident. Lawson described the accident as follows:
His first wheel rolled across the hill [of cement in which the sign was embedded] and it went up like. And then when he came down he looked to see what he hit and then after he noticed what he did he just kept on going and when the rear wheel went over the same hill the thing flipped over.
Lawson also testified that as the forklift turned over onto its side Ingram apparently attempted to jump from the forklift.
L.E. Gardner, a supervisor at Kaiser, also testified. Gardner indicated that the truck crossing sign and pole had been hit prior to the accident. However Gardner also testified that immediately after the accident he saw fresh rubber tire marks on the truck crossing sign.
In addition, on direct examination Lawson testified that the forklift may have scraped the side of the pole but he couldn’t be certain. However, on cross examination Lawson testified that several days after the accident he told an OSHA investigator that the forklift did in fact hit the pole.
Thomas Lajeunesse, Caterpillar’s Manager of Product Safety and Ecology, testified as follows: With the exception of one extremely large model forklift, neither seat belts nor cages have ever been installed by Caterpillar on any of its forklifts. In addition, with a few exceptions, the overhead guard is required by Federal law on forklifts. The top speed of the model M-80 forklift is approximately 6.7 m.p.h. without a load or 5.7 m.p.h. with a load. Due to their design forklifts generally are laterally unstable. The proper reaction in a lateral turnover is for the operator to stay with the vehicle and hold on rather than attempting to jump from the truck and possibly getting caught under the overhead guard. However, there was no instruction which specifically notified the operator that in a lateral turnover he should stay with the vehicle and hold on rather than jumping from the forklift.
*744 Lajeunesse also testified regarding the American National Safety Institute (“A.N. S.I.”) standards for forklifts. According to Lajeunesse in order to meet A.N.S.I. safety standards a forklift would have to be tilted to a slope of 27% before tipping over, and that the Caterpillar M-80 is capable of sustaining a tilt of up to 62.9% before tipping over.
In addition Lajeunesse testified that seat belts were not placed on the forklifts for the following reasons: Caterpillar ascertained that seat belts would hamper the frequent use of the forklifts in reverse thereby increasing the incidence of pedestrian-forklift accidents. Seat belts would also hamper driver positioning for loading and unloading with clear visibility. In addition, seatbelts would hinder the driver’s ability to escape from the forklift during some types of accidents. Lajeunesse also testified that OSHA regulations prevent employers, such as Kaiser, from providing restraint devices on lift trucks.[2]
Finally, Lajeunesse testified that Caterpillar’s approach to dealing with the possibility of lateral tipover was to provide instructions on how to avoid an accident rather than what to do if an accident actually occurs. Lajeunesse stated that lateral upset accidents occur so quickly that instructions on what to do in that type of accident would not be of much use as the driver’s instinctive reaction would predominate in the one or two seconds in which the driver has to react. Additionally, lateral accidents happen in a variety of situations, and any one instruction on what to do could be inappropriate depending on the circumstances of the accident. Lajeunesse rendered the opinion that it is unlikely that an operator restraint would have prevented Ingram’s death under these circumstances. In Lajeunesse’s opinion even with an occupant restraint, Ingram’s head would have hit the ground resulting in a very serious or fatal injury.
Robert Lipp, an associate professor of mechanical engineering was qualified as an expert in mechanical engineering and testified for the plaintiff. Lipp has a B.S. in Civil Engineering, a M.S. in Civil Engineering, a M.S. in Mathematics and a M.S. in Engineering Mechanics. Lipp had however never worked specifically with forklift trucks. Lipp testified that if Ingram had been wearing a seat belt the overhead guard would not have fallen on top of him. He also stated that the forklift was reasonably designed but in a rollover situation the forklift is unsafe. In addition, Lipp concluded that due to the nature of the vehicle, Caterpillar must have anticipated lateral instability. However, on cross examination he unequivocally testified that the fork lift hit the truck crossing sign post prior to turning over onto its side, and that the forklift would not have turned over had Mr. Ingram not hit the truck crossing sign post.
Finally, James H. McElhaney testified for the defendant. McElhaney was accepted by the court as an expert in the field of biomechanics, and specifically in the field of head and neck injuries and restraint system design and application. McElhaney is a professor of biomechanics and teaches Biomedical Engineering. He has a B.S. and a M.S. in Mechanical Engineering and a Ph.D. in theoretical and acquired mechanics with a major in biomechanics. In addition, McElhaney was a consultant for the National Institute of Health on head and neck injuries. McElhaney also worked as a consultant for Caterpillar in a capacity in which he specifically evaluated the protective potential of seat belts and performed tests with regard to restraint systems and their applications to forklift trucks.
McElhaney testified that even with a seat belt, due to the small capacity of the driver’s compartment, in a lateral turnover of a forklift the driver’s head would be whipped to the ground. Additionally, in McElhaney’s opinion even if Ingram had been wearing a seat belt at the time of the accident, although he would not have been caught beneath the overhead guard, he *745 probably would have suffered a fatal head injury. McElhaney also testified that in design when one considers the whole spectrum of risks one must be careful “that you don’t merely change what we call the injury mechanism that you don’t go from a head injury to a neck injury.”
McElhaney also testified that the proper response in a lateral overturn accident is to hold tightly to the steering wheel and lean away from the turn. In addition McElha-ney, corroborating Lajeunesse’s testimony, testified that in a lateral overturn situation the driver has approximately two seconds to decide what to do.
McElhaney also testified that he had conducted tests on lift truck restraint systems in order to determine whether providing any particular type of restraint system would improve lift truck safety. Based on those tests he concluded that restraint systems would not improve lift truck safety, and specifically that in a lateral accident the operator’s head, because he is lap belted, would be whipped into the pavement. In sum, McElhaney concluded that lap belts offer no protection in the lateral upset of a forklift, and would in fact create a hazard in types of accidents where the operator had to escape qiuckly from the truck e.g., fire, explosion, chemical spills; accidents where the lift truck goes off the side of a dock; and those accidents in which another lift truck is involved, i.e. where the forks of one forklift enter the driver’s compartment of another forklift.
Caterpillar first claims that the plaintiff failed to prove that the forklift was defective.
A manufacturer of a product which involves a risk of injury to the user is liable to any person, who without fault on his part sustains an injury caused by a defect in design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff’s injuries were caused by reason of the defect.
Weber v. Fidelity & Casualty Insurance Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971).
Plaintiff alleges three defects in the Caterpillar M-80 lift truck: failure to provide a suspension system which would make the lift truck laterally stable, failure to warn operators of the risk of injury in jumping from the lift truck during a lateral turnover or to instruct the operators that they should stay with the truck and lean into the turn; and failure to provide an occupant restraint system.
Thus, in order to prove that the design of forklift was defective, plaintiff had to prove that any of the three alleged defects rendered the forklift unreasonably dangerous to normal use.
A product is unreasonably dangerous when it is dangerous to an extent beyond that which would be contemplated by an ordinary consumer. Hebert v. Brazzel, 403 So.2d 1242 (La.1981). See, Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, ft. note 2 at p. 114 (La.1986). “The ‘normal use’ of a product is its foreseeable use and may include something broader than use exactly in accordance with a manufacturer’s instructions. Pawlak v. Brown, 430 So.2d 1346 (La.App. 3rd Cir.1983) writ denied, 439 So.2d 1072 (La.1983).” Quattlebaum v. Hy-Reach Equipment Inc., 453 So.2d 578 (La.App. 1st Cir.1984).
We find that evidence presented at trial provides no factual basis upon which the jury could have found the lift truck unreasonably dangerous to normal use.
With regard to plaintiff’s first allegation that Caterpillar failed to provide a suspension system which would make the lift truck more stable, absolutely no evidence was introduced to show that there is a feasible way to design a lift truck to give it more lateral stability while retaining the required maneuverability. There was, on the other hand, substantial evidence that the Caterpillar M-80 electric-powered lift truck is one of the most stable models on the market, and that it is very difficult to overturn. If this model forklift is inherently dangerous, then every forklift is inher *746 ently dangerous. The unique facts of this case show that the accident did not occur in normal use, and on this evidence, it was manifest error to find that the M-80’s lateral instability renders it unreasonably dangerous.
The second defect alleged by plaintiff is that Caterpillar neither warned operators of the risk of injury in jumping from the lift truck during a lateral overturn nor instructed operators that they should try to stay with the truck if it overturned. Manufacturers are liable only for failure to warn about dangers inherent in the normal use of their products. Chappuis v. Sears Roebuck and Co., 358 So.2d 926 (La.1978). The evidence in this case shows that Bill Ingram was not exposed to a risk of injury which arose while the lift truck was in normal use. All of the expert witnesses testified that the truck must have run up on the metal sign post, and the Kaiser foreman testified that there were tire marks on the post following the accident. The exhibits corroborate this testimony. Caterpillar’s expert testified that the M-80 can sustain a tilt of 62.9% from horizontal before overturning. Clearly, running upon a post causing the truck to tilt more than 62.9% is not normal use. Moreover, Caterpillar’s expert, Mr. Lajeunesse testified that the manufacturer had no record of any other lateral overturns involving injury on the M-80 model or on any models in that product line. Considering all types of lift trucks in use today, lateral overturns represent only one to two percent of all accidents, and the ratio of lateral overturns in the M-80 family of trucks is approximately twelve times less than for all lift trucks. Given this rarity of lateral overturns, it cannot be said that the dangers inherent in a lateral overturn arise during normal use, obligating Caterpillar to provide a warning. Nor can it be overemphasized that lateral accidents happen in a variety of situations, and any one instruction on what to do could be inappropriate depending on the circumstances of the accident. Hence, the M-80 could not have been found unreasonably dangerous because Caterpillar failed to warn of the risks of a lateral turnover.
Finally, plaintiff alleges that the lift truck was unreasonably dangerous for failure to provide an occupant restraint. There was extensive testimony from Mr. McElhaney, based on testing and his extensive experience in the field, that the addition of a seatbelt to the forklift would not improve safety but would in fact increase the risk of injury or merely change the “injury mechanism” in accident situations. The only evidence to the contrary, unsupported by any experience with or testing of forklifts and restraint systems, was Lipp’s bare assertion that a seat belt would have prevented Ingram’s accident. It was manifest error for the jury to have found that the lack of occupant restraint is a defect in the M-80 lift truck.
We find that the evidence in the record does not provide a reasonable factual basis for the trial court’s verdict and it was manifest error for the jury to find the forklift defective, therefore, we need not address appellant’s other claims.
For the foregoing reasons the judgment of the trial court is reversed.
REVERSED.
GULOTTA, C.J., and HUFFT, J., pro tem., dissent with reasons.

. The overhead guard consists of four posts and an overhead steel canopy. It is a safety device used to prevent objects from falling on the operator’s head.

. 29 C.F.R. § 1910.178(a)(4) states in part that "Modifications and additions which affect capacity and safe operation shall not be performed by the customer or user without manufacturers prior written approval."