535 So.2d 723 (1988)
Linda INGRAM, Widow of William C. Ingram, Individually and as Administratrix of the Estate of the Minor Children, William Ingram, Jr. and Tommy Ingram
v.
CATERPILLAR MACHINERY CORPORATION, Caterpillar Tractor Company, ABC Insurance Company, XYZ Insurance Company and Boyce Machinery Corporation.
Nos. 87-C-2056, 87-C-2095.
Supreme Court of Louisiana.
December 12, 1988.
Rehearing Denied January 19, 1989.
*724 Glenn Diaz, John Robichaux, Jr., Chalmette, for Linda Ingram et al.
Colvin Norwood, Jr., Michael Noonan, John Turner, Jr., McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, for Caterpillar Machinery Corp. et al.
Judith Atkinson, Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, for other respondents.
George Cain, Jr., Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, for intervenor.
LEMMON, Justice.
This is a wrongful death action against the manufacturer of the forklift truck which overturned and killed William Ingram while he was operating the truck in the course of his employment in an industrial plant. We granted certiorari to review the intermediate court's reversal of a jury verdict in favor of plaintiffs. The principal issue involves the manufacturer's duty to warn operators of forklift trucks as to the proper procedure to follow when a truck turns over laterally.
Ingram was transporting a 900-pound coil of wire on the forks of an M-80 forklift truck manufactured by defendant. As he maneuvered down a slightly inclined paved driveway, the forklift turned over and landed on its side. Ingram apparently tried to jump from the operator's seat and was crushed under the overhead guard, a federally required safety device consisting of four posts and a steel canopy and designed to prevent injury to the operator by falling objects.
*725 The driveway, which ran from the doorway of a metal building to a main road on the industrial plant, was delineated by a yellow line on each side. At the intersection of the driveway and the road, there was a yellow striped triangular area. The driveway (without the signpost that Ingram struck) is shown in the following photograph:

At the time of the accident aluminum was stacked on both sides of the driveway. Inside the yellow striped area at the intersection of the driveway and the plant road was a steel post holding a sign marked "Truck Crossing". The vicinity of the accident, as it appeared at the time of the tragedy (except for the closed door), is shown on the following photograph:
*726 
Lawrence Lawson, the only eyewitness to the accident, testified that Ingram, driving at a normal speed, did not come straight down the driveway, but came down at an angle to his left; that the truck's left front wheel rolled over a rise in the pavement surrounding the signpost; that the truck shook when the front wheel came down; that Ingram did not attempt to stop, but continued forward and looked down to his left to see what he had hit; and that when the left rear wheel rolled upon the rise and the side of the machine scraped against the post, the forklift turned over onto its side.[1]
Inspection of the forklift after the accident revealed that there had not been any mechanical misfunction of the machine.
Plaintiffs presented the case to the jury on the theory that defendant's forklift was unreasonably dangerous in normal use because the design of the truck's suspension system caused a substantial risk of lateral overturn and because the manufacturer did not provide safety belts or other devices to insure the safety of the operator in the event of a foreseeable overturn. Plaintiffs further theorized that defendant failed to provide a warning to operators of the defect and of the proper course of conduct in order to escape injury during an overturn.
The jury, in response to special interrogatories, rendered a verdict for the plaintiffs, finding that (1) Ingram's death resulted "from a defective condition in the forklift", (2) the "defective condition" made the forklift "unreasonably dangerous to normal use", (3) the "defective condition exist[ed] at the time the forklift left [defendant's] control", and (4) no negligence on Ingram's part contributed to his fatal injury. The jury fixed the damages at $1,175,000.
*727 The court of appeal reversed in a three-two decision, concluding there was no factual basis for the jury's finding that the lift truck was unreasonably dangerous in normal use. 510 So.2d 741. The court pointed out that although some lateral instability is a necessary evil resulting from the shape of a forklift that is required for maneuverability, the M-80 lift truck was one of the most stable on the market. The court held the jury's finding was manifestly erroneous because the unique facts of the case indicated the accident did not occur in normal use, but rather occurred because of Ingram's misuse in striking the post. As to the failure to provide a seat belt or restraint system, the intermediate court determined the expert evidence preponderated in favor of a conclusion that addition of such a device would not improve safety for the operator. Finally, as to the failure to warn, the court noted that a manufacturer is only required to warn of dangers inherent in the normal use of the product and reiterated that Ingram's injury did not result from a risk which arose while the lift truck was in normal use. We granted certiorari, particularly to consider the issue of the necessity of a warning in this case. 514 So.2d 117.
The function of a forklift truck is to pick up, transport and stack loads at various heights, sometimes above the operator's head. Because of this function and because of the limited space in which the truck often operates, the trucks are generally narrow and tall.[2] This design results in a high center of gravity and a corresponding lack of lateral stability, especially when the forklift is in motion. The lateral instability of a forklift increases with an increase in speed or during turns, or with an increase in the amount or the height of the load. In this 1980 accident, however, Ingram was traveling at a reasonable speed transporting a 900-pound load (slightly over one-tenth of capacity) at a height of only fifty-two inches.
The M-80 electric forklift, which was first manufactured in 1972, had much greater lateral stability than the earlier gas-powered trucks because the 3,000-pound battery in the base of the machine provided better weight distribution and lowered the center of gravity.[3] While the standards for lateral stability established for forklift trucks by the American National Standards Institute provided that a slope of twenty-seven per cent was acceptable, the M-80 was capable of tilting to a slope of over sixty-two per cent without overturning.[4] Defendant's manager of product safety testified that Ingram's accident was the only reported lateral upset by an M-80 forklift.
The mechanical engineer presented by plaintiffs conceded that the M-80 had no defect in design as to stability and that Ingram's M-80 would not have turned over if he had not hit the post.[5] However, the engineer opined that the M-80 presented an unreasonable risk of injury in foreseeable lateral overturns because of the lack of seat belts or other restraints. Inasmuch as the overhead guard could not strike an operator who was restrained in the seat by a lap belt or other device, he concluded that a seat belt would have prevented this accident. He explained that the unrestrained operator of an overturning forklift falls free and reaches the ground faster than the side of the truck because the contact of *728 the wheels with the ground prevents the truck from falling freely. He further stated that other restraints or an enclosed cab would have kept Ingram inside the truck and could have prevented the injury. Finally, he noted that an operator should be instructed not to jump if the forklift overturns laterally, but to hold onto the steering wheel and to lean away from the ground.
In response defendants presented an expert in biomechanics who had performed studies in protecting against neck and head injuries and in using restraint systems in different types of vehicles.[6] These studies involved simulation of accidents, estimation of the forces involved, and establishment of human tolerance data. Additionally, the expert had performed an extensive study for defendant of the protective potential of seat belts in the lateral overturn of forklift trucks.
The expert opined that installation and use of lap belts in forklifts would not promote safety. He noted that lap belts have a salutary effect in high speed frontal collisions of automobiles by restraining the operator from contact with the dashboard and windshield, but offer no protection in the lateral collisions or layovers which occur much less frequently. By contrast, frontal collisions are not a hazard for operators of forklifts which travel at less than seven miles per hour.
According to the expert, lap belts would not have prevented Ingram from sustaining a serious injury since restraint of an operator's hips during a lateral upset of a narrow forklift causes the operator's head to be whipped into the ground at a high velocity. He added that a seat belt might also be a detriment in situations in which the driver must leave the truck hurriedly, such as fires, explosions, spills, collisions with loaded forklifts and running off of riverside docks. Observing that a shoulder strap was designed for frontal collisions and would not prevent head whipping in a lateral overturn of a forklift, the expert stated that he would have advised against the installation of seat belts in narrow forklift trucks.
Finally, pointing out that lateral overturns comprise only a small percentage of forklift accidents, the expert stated that an enclosed cabin would present the same head whipping problem as seat belts while impairing visibility and resulting in greater danger of hitting a pedestrian, which is the most frequent type of forklift accident. He also averred that a wing back chair not only would be ineffective in the narrow cab, but also could hinder the operator in looking around a load in transport and in leaning away from the direction of the fall in the event of an overturn.
The expert concluded that a seat belt or similar restraint would not have prevented Ingram's fatal injury.[7] He advised that the way to prevent injury in lateral overturns is to instruct the operator to hold on tight and lean away from the direction of the fall, noting that an operator in a seat belt must hold on tighter to overcome the whipping action.
The jury apparently found that the forklift was unreasonably dangerous without operator restraints. We agree with the court of appeal that plaintiff's expert's bare statement that a seat belt would have prevented Ingram's injury is insufficient to support the jury's finding. This unexplained assertion by a civil engineer, inexperienced in forklift design and unassisted by experience or studies in forklift hazards, does not provide an adequate basis for establishing a design defect. On this record the credible evidence supported by reasoned explanations greatly preponderates in favor of a conclusion that defendant reasonably rejected installation of seat belts as a means of enhancing overall safety and that use of a seat belt would not have prevented Ingram's injury, but at most would only have changed the injury mechanism. We therefore conclude that *729 the jury's verdict in this respect should be disregarded.
The issue of defendant's failure to warn presents different considerations. By its own expert's testimony defendant knew that there were approximately 450 to 500 forklift accidents in the United States each year involving lateral overturns. Defendant also knew that lateral instability was inherent in the shape of a forklift truck designed to maneuver in narrow places and to lift heavy loads high into the air. Defendant further knew that the overhead guard, while preventing injuries from falling objects, was a potential killer in lateral overturns. Indeed, defendant was concerned enough with the danger of lateral overturns in forklifts to employ an expert to conduct extensive testing involving the use of seat belts.
Significantly, defendant was also aware that if a forklift was carelessly used and turned over laterally, the operator who chose to jump would be severely injured or killed. Yet defendant did nothing to provide either a warning to operators of the danger of jumping in case of lateral overturn or an instruction as to the proper procedure in case of such an eventuality.
Defendant contends that it fulfilled its duty to warn because other warnings posted on the machine instructed the operator how to avoid an accident such as the one which occurred in this case. The court of appeal apparently agreed with this contention and ruled that Ingram was not exposed to any risk of injury inherent in the normal use of the product, but that the accident occurred when the product was not in normal use.[8] The court of appeal erred in this respect.
Normal use is a term of art which includes all intended uses, as well as all foreseeable uses and misuses, of the product. Bloxom v. Bloxom, 512 So.2d 839 (La.1987). Here, Ingram was using the machine to transport a load of wire from one place on the plant to another, which is clearly a normal use. His arguably careless use of the forklift by striking the post was certainly foreseeable.[9] Such careless use does not constitute conduct outside of normal use, but rather constitutes contributory fault by the operator which reduces his recovery without absolving the manufacturer of its liability for failure to warn.
A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user. Halphen v. Johns Manville, 484 So.2d 110 (La.1986). The operator of a forklift cannot reasonably be expected to know from logic or experience that, in the event the forklift overturns laterally, he will be seriously injured or killed if he jumps, but will be safe if he holds on tightly and leans in the direction away from the fall. This information is based on principles of physics, and it is the duty of the forklift manufacturer to warn operators not only that forklifts are laterally unstable and can be overturned by misuse, but also that certain procedures (such as jumping) which an operator might reasonably choose in the event of a foreseeable lateral overturn are extremely dangerous. Warning only that misuse can cause overturns did not fulfill the manufacturer's duty in this case.
An essential element of a cause of action based on failure to adequately warn of a product's danger is that there must be a reasonable relationship between the omission of the manufacturer and the injury. Bloxom v. Bloxom, supra. In the present case defendant provided numerous warnings, but did not warn of the danger of jumping in the event of a lateral overturn of the forklift, an occurrence which defendant knew happened about twice per working day in forklifts throughout the country. Without this warning, Ingram could not *730 reasonably be expected to know that it was unsafe to jump. Therefore, the evidence established that defendant had the duty to warn, that defendant failed to discharge that duty, and that Ingram, denied the benefit of the warning, instinctively chose the improper alternative and jumped to his death. The lack of an adequate warning thus had a causal relationship with the injury, and one could reasonably infer that Ingram would have heeded the warning not to jump if such a warning had been given. Defendant is accordingly liable for the damages caused by its breach of duty.
Ingram was contributorily at fault because of his failure to use reasonable care in operating the forklift. He had traversed the area many times and undoubtedly was aware of the signpost at the edge of the driveway. Nevertheless, he drove down the driveway at an angle to the left and maneuvered the truck dangerously near the sign. The fact that the load on the front of the forklift obstructed his view to some extent should have dictated more care in avoiding the sign. Moreover, Ingram did not attempt to stop when he rolled over the mound surrounding the signpost, but continued forward while looking to see what he had hit.
In determining apportionment of fault, the court or jury should consider the nature of the conduct of each party at fault and the extent of the causal relation between the conduct and the damages. See Uniform Comparative Fault Act § 2(b), 12 U.L.A. 53 (1988 supp.). The factors to be considered include (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Watson v. State Farm Fire and Casualty Insurance Co., 469 So. 2d 967 (La.1985).
Here, plaintiff's substandard conduct resulted from inadvertence during routine employment procedures and caused no significant risk of harm to others. Defendant's fault, on the other hand, involved a breach of duty relating to a known but nonapparent risk and created a risk of harm to all users of its products. After considering all of the factors listed above and the respective duties and risk-creating fault of both parties, we apportion the percentages of fault at one-third to plaintiff and two-thirds to defendant.
The jury's lump sum award was $1,175,000. The trial judge had instructed the jurors that they could consider awarding damages for Ingram's conscious pain and suffering and for his survivors' loss of support and loss of love and affection.
The record does not support an award for conscious pain and suffering.
As to loss of support, the only economist who appeared at trial assigned $676,364 as the present value of the loss of support. He considered Ingram's twenty-two-year work life expectancy and his earnings from the industrial plant, as well as the income from a trophy shop the Ingrams were operating. Because of Ingram's many years of coaching and his contacts in sports, the economist assigned a reasonable increase in productivity to the latter income between Ingram's death and the trial. The economist properly excluded from gross income a reasonable amount attributable to Ingram's use on himself and applied reasonable rates of inflation and return on investments to reach a discounted figure for loss of support.
We conclude that the jury could reasonably have awarded on this uncontradicted evidence an amount for loss of support in the range of the amount suggested by the economist. The remainder of the jury's award, something less that $500,000 must be attributed to loss of love and affection.
Ingram was thirty-four years old at the time of his death. He and his wife had two boys who were fifteen and twelve when their father died.
The evidence indicated that the family was extraordinarily close and loving. The children testified that Ingram was both a *731 father and a friend to them, taking them fishing, hunting and camping. The family took numerous vacations together and had a camp where they spent time together. Ingram coached his sons in football and other sports for many years.
After their father's death, both children quit playing sports and dropped out of school. One boy testified that if his father were alive, he would still be in school and would be happy.
Ingram and his wife had been married sixteen years. Mrs. Ingram stated that the loss of her husband was a severe burden on the family, both financially and emotionally.
Plaintiffs cite the recent case of Hellmers v. Department of Transportation and Development, 503 So.2d 174 (La.App. 4th Cir.1987), in which the court upheld an award of $225,000 to each of the three children for loss of love and companionship of their mother, and an award of $325,000 to the decedent's husband. The decedent was thirty years old at the time of her death, had a happy marriage, was devoted to her children, and had many other talents and hobbies.
The cases cited by defendant show that a lower award for loss of love and affection has been permissible. Nevertheless, because Ingram was an outstanding husband and father who devoted his time and resources to his family, and because Ingram's minor children lost the emotional support and friendship of their father during crucial formative years, we conclude that an award of $100,000 to $150,000 to each of the children and $200,000 to $300,000 to the widow for loss of love and affection was not an abuse of discretion.
For the above reasons, the judgment of the court of appeal is reversed, and judgment is rendered in favor of plaintiffs, Linda Ingram, widow of William C. Ingram, individually and as administratrix of the estate of the minor children, William Ingram, Jr. and Tommy Ingram, and against defendant, Caterpillar Tractor Company, for the total amount of damages awarded by the jury, reduced by one-third on account of the fault apportioned to William C. Ingram, together with legal interest from the date of judicial demand and all costs of court.
NOTES
[1] There apparently was little dispute that the truck hit the post. A plant supervisor who came to the scene shortly after the accident noted fresh rubber tire marks on the post.
[2] Forklifts vary in size, capacity, type of power and other features. The M-80 forklift at issue in this litigation was an electric-powered, cushion tire truck with a capacity of 8,000 pounds. Ingram's M-80 measured fifty-eight inches from the floor to the top of the guard and fifty-eight inches from the front to the rear wheels, had a forty-four-inch wheel base, and was capable of lifting a capacity load to eleven and one-half feet. This model had a top speed of 6.7 miles per hour, but only 5.7 with a full load.
[3] The M-80 driven by Ingram was manufactured in 1975.
[4] Apparently the standard test is in a static condition. The record does not indicate the acceptable slope for a forklift in motion or during turns when instability is much greater.
[5] The witness was accepted as an expert in mechanical engineering and machine design, but had no specific experience in the design of forklift trucks. He based his opinions on basic principles applicable to all machines.
[6] Biomechanics is the study of the principles and relations involved in the mechanical bases of biological and muscular activity.
[7] The expert stated that seat belts may be useful in a very large forklift with a wide cab.
[8] The court stated that "running upon a post causing a truck to tilt more than 62.9 is not normal use". As noting in footnote 4, the acceptable slope of a forklift in motion during a turn is not shown in the record.
[9] Photographs of the forklift showed scrapes and marks from running into objects. Testimony established that forklifts frequently hit stationary objects.