646 So.2d 933 (1994)
Kevin HOPPER
v.
CROWN, et al.
No. CA 93 2021.
Court of Appeal of Louisiana, First Circuit.
October 7, 1994.
Rehearing Denied December 12, 1994.
*935 Gordon R. Crawford, Gonzales, for plaintiff-appellee, Kevin Hopper.
Lewis O. Unglesby, Baton Rouge, for plaintiff-appellee, Kevin Hopper.
William J. Hamlin, New Orleans, for defendant-appellant, Crown Equipment Corp.
Gerald Walters, Baton Rouge, for defendant-appellant, Legion Cas. Co.
Before EDWARDS, LeBLANC and PITCHER, JJ.
EDWARDS, Judge.
Defendant, Crown Controls Corporation (Crown), appeals the trial court's judgment in favor of the plaintiff, Kevin Hopper. In this product liability suit, the trial court found that the harm was caused by the condition of the product, a model 45RR narrow aisle stand-up rider forklift manufactured by Crown, and that the condition of the forklift, the absence of a door to cover the opening at the rear of the forklift, was unreasonably dangerous to normal use. It was undisputed that the condition existed at the time the forklift left Crown's control. We affirm.

PROCEDURAL BACKGROUND AND FACTS
Mr. Hopper was employed by Associated Grocers (AG) and injured while operating the forklift in his employer's warehouse. While attempting to go from one section of the warehouse to another, the mast of the forklift struck an overhanging steel roll-up door. Mr. Hopper was ejected on impact with the overhead door and landed with his feet about two to three feet from the forklift and his body extending further away from the forklift. Part of the concrete wall above and around the doorway, apparently including a concrete beam, fell, bounced off of the overhead guard and hit Mr. Hopper primarily on his back, neck, and head, severely injuring him.
The forklift used by Mr. Hopper was designed with a partially enclosed operator's compartment, ending at about hip level, with an overhead protective guard and an opening at the back of the machine opposite the forks and mast. To operate the forklift, the driver stood in the compartment facing the side of the machine with the forks to the right and leaned against the opposite side. The forklift had hand and foot controls with the hand controls located near the top level of the side enclosure.
The function of the forklift was to pick up, transport, and stack loads at various heights, often above the operator's head. The 45RR series was designed for use in warehouses and designed specifically to fit within the narrow warehouse aisles. In fact, Mr. Hopper testified that he operated in the warehouse, loaded and unloaded material near the loading dock, but not on the dock. Another employee testified that the 45RR forklifts were used only in the interior, and not on exterior docks or to load trucks.
The overhead steel door had been installed in the warehouse approximately ten years before the accident. Several doors in the warehouse, including the steel door involved in the accident, had a clearance of 120 inches. The Crown forklift required a minimum clearance of 119 inches.
The problem with the low clearance between the doors and the forklifts did not arise until Mr. Hopper's employer purchased Crown forklifts about seven months before the accident. The Crown forklifts were two to three feet taller than the forklifts previously used by AG. Mr. Hopper received no special training from Crown, the manufacturer, Boyce Machinery Corporation, the local *936 distributor, or AG before operating the new forklifts.
On the day of the accident, Mr. Hopper successfully negotiated the doorway several times before the accident. Mr. Hopper testified that he usually went through the doorway slowly, but could not remember exactly how fast he was going when the mast impacted the door. Mr. Hopper did not believe he could have been going the maximum speed because he had to negotiate a turn just before entering the doorway. Mr. Hopper believed that his load would have shifted off of the forks if he had negotiated the turn at full speed. The maximum speed of the forklift was six miles an hour. No one witnessed the accident.
As a result of the concrete blocks and beam from the wall hitting Mr. Hopper, he was rendered a paraplegic. His marriage, a marriage that took place only about four months before the accident, failed. It is undisputed that Mr. Hopper suffered severe emotional and physical trauma because of the injuries and has experienced several recurring medical problems related to his paraplegia. Mr. Hopper's need for ongoing future medical care and aid because of his condition was also undisputed.
Mr. Hopper filed suit against several defendants, including Crown, its insurer, and Boyce Machinery Corporation (Boyce), on March 17, 1987, seeking damages for injuries he sustained in the accident on April 6, 1986. Crown, and its insurer, were the only remaining defendants at the time of trial.
Mr. Hopper alleged in his petition that Crown was negligent and liable for damages because Crown failed to use an alternate design, that of a forklift with adequate driver restraints to prevent ejection after a collision, and that Crown failed in its duty to warn of the dangers posed by the design defect.
Crown answered and argued that the forklift was not defective as designed because the forklift met industry standards, the industry did not recommend doors and favored the easier egress and ingress for the drivers without a door, and driver restraints as standard equipment would create a greater risk of harm. Therefore, driver restraints were not safer alternative designs.
In certain types of accidents, termed "dock-offs," Crown asserted that it was better for the driver to jump or step out of the forklift, unimpeded by a door, when he realized that the forklift was in danger or beginning to fall off of a loading dock. Crown believed that when a loaded, top heavy forklift began to "tip over," on a dock or in the aisles of a warehouse, the driver should be able to quickly step out of the rear opening to avoid going over in the driver's compartment with the forklift.
Crown argued that it had no duty to warn of the danger of ejection upon collision because the lack of a restraint system and the possibility of injury, as the result of an ejection, were obvious.

EXPERT TESTIMONY ON DEFECTIVE DESIGN AND INJURY
John Sevart, an engineer accepted as an expert in the field of mechanical engineering and machine design relating to safety, testified for plaintiff. Mr. Sevart explained that the 45RR forklift was intended to be used indoors in buildings with relatively narrow aisles, such as warehouses. The RR designates the machine as a rider reach truck with special attachments to reach into stacks. It was not designed for dock work and is not as useful for dock loading because the height of the mast precludes its use in many enclosed truck trailers. Other types of forklifts are recommended by Crown and other manufacturers for loading dock work.
In Mr. Sevart's opinion, the most common type of accident affecting the operator in warehouse settings is crushing of the extremities through the open door of the forklift. Another common accident is ejection from the machine. Both types of accidents are caused by the penetration or intrusion of objects into the operator's compartment or collisions with other objects. Mr. Sevart believed that staying with the machine, a safety recommendation given with most industrial or agricultural machinery, including sit-down forklifts, would be the safest alternative in almost every type of accident, with a few exceptions. The operator is protected by an *937 overhead guard and within the enclosure. An operator restraint, such as a door, would help the operator stay in the protected compartment, avoiding many of the injuries from intrusions, collisions, and injuries that occur when the operator jumps or falls from the forklift and is hit by the falling machine or by other falling objects.
In Mr. Sevart's opinion, a warning of the danger of collisions and the effect of the opening in the operator compartment would not have prevented the accident. The collision was unexpected and occurred too rapidly for Mr. Hopper to make any conscious decision to brace and keep himself within the compartment.
Although Crown made doors for some customers and Crown's major competitors offered doors as safety options for warehouse type settings, Mr. Sevart, in his position on several industry committees concerned with forklift safety, had not heard of a reported accident involving a stand-up forklift with a door. However, Mr. Sevart admitted that the B56.1 Sub-committee of the American National Standards Institute (ANSI), whose concern is forklift safety, voted down his proposal to make doors standard equipment on stand-up forklifts and no industry group favored the addition of a door as standard equipment. The standards published by the American Society of Mechanical Engineers (ASME) in association with ANSI did allow enclosures with easy egress and ingress and included requirements for doors to be used with stand-up forklifts. The requirements insure the door or enclosure offers protection for the operator from intrusion and collisions.
Mr. Sevart testified that Crown had not done a human factors analysis or testing to determine the factors at work on the machine and operator during an accident. To Mr. Sevart's knowledge, Crown had not done specific testing to determine the actual timing in a falling forklift or whether a door properly designed to allow easy egress and ingress would hinder or sufficiently slow the operator in efforts to step out of the compartment. Mr. Sevart testified that, based on his own testing and analysis, the door added only one half second to the time an operator has to jump. Mr. Sevart was unaware of any testing by Crown to determine the hazards and risks associated with and without doors in dock-offs or tip overs. In Mr. Sevart's opinion, testing would have shown Crown the error in their position that the addition of a door would create more safety risks than a forklift without a door.
Mr. Sevart testified that collisions and objects falling from overhead are foreseeable accidents. The forklift is equipped with an overhead guard to provide protection for the operator in such cases and the Crown instruction and training manual for the RR series warns operators to stay within the enclosure and avoid collisions. In Mr. Sevart's opinion, the forklift with a door is a feasible alternative design that would produce less harmful results than the forklift without a door. The forklift with a door would have prevented the injuries to Mr. Hopper and any impact with the door upon collision would not have produced the type of serious injuries that occurred. Therefore, in his opinion, the forklift without a door was unreasonably dangerous and defective in design.
Dr. Richard McLay, an engineer, was offered by the plaintiff and accepted by the court as an expert in the fields of engineering mechanics, with an expertise in accident reconstruction; restraint systems; injury causation; and bioengineering. Dr. McLay based his opinion on his expertise and a computerized simulation video he created of the accident analyzing the accident in a forklift without a door and with a door. The simulation was based on information from Crown, Mr. Hopper, photographs, and engineering texts.
Without the door, Mr. Hopper was ejected and severely injured when the concrete beam and blocks hit him after bouncing off the overhead guard. Based on the fact that Mr. Hopper was ejected from the forklift, was thrown to the ground, and was hit in the upper body several feet from the forklift, Dr. McLay calculated that the concrete moved away from the impact with the overhead guard in a parabolic arc. With a door preventing ejection, the computer simulation demonstrated that Mr. Hopper would not have been thrown from the forklift, given the *938 forces involved in the collision. Dr. McLay did not believe that Mr. Hopper would have been hit by the large concrete beam or blocks, even if his body had bent over the door and his upper body extended a few feet beyond the overhead guard.
As a rebuttal witness, Dr. McLay testified about the results of a computer study, a study he ran after his initial testimony, of dock-off and tip over type accidents and the possibility of injury. Dr. McLay reviewed the Crown video demonstration of dock-off and tip over types of accidents, reviewed a scientific paper by Crown's expert, Dr. Entwisle, computed the jump time of the driver, and utilized these computations in his computer study and analysis. Using the computer program, Dr. McLay was able to study the motion of the forklift in various maneuvers, compute the forces and velocities involved, and predict injuries in the compartment of a falling forklift. From the results of the computer study, Dr. McLay determined that, before the forklift falls, the operator has sufficient time to restrain himself within the compartment in a position to protect the operator's head and extremities and brace for the fall. The door helps the operator to stay within the compartment, which was not crushed in any of the demonstrated accidents. In Dr. McLay's opinion, the operator can be badly injured trying to jump from the forklift. Based on the computer study of dock-off and tip over type accidents, the operator is safer bracing for the accident and staying within the enclosure created by the compartment and the overhead guard.
In Dr. McLay's opinion, the Crown 45RR forklift, designed for use in a specific work environment, a warehouse, was defective without a door.
Plaintiff called Dr. Waymon L. Johnston, a professor of safety engineering at Texas A & M University, who was accepted by the court as an expert in industrial safety engineering, machine design, warnings, and machine safety. In Dr. Johnston's opinion, a designer should identify the environment of use and the hazards associated with the product in that environment, try to eliminate by testing various design changes, and where a hazard cannot be eliminated, develop a warning to the user of the danger.
Dr. Johnston testified that he was familiar with Crown's position that the forklift was not offered with a door as a safety option because Crown believed that it was safer for the operator to jump or step off of the machine in certain types of accidents and that the addition of a door increased the risk to the operator. However, Dr. Johnston testified that Crown does not recommend jumping or stepping off of the machine in any of the literature supplied with the machine and the warnings given in the literature are to stay within the compartment. Dr. Johnston noted that the presence of an overhead guard as standard equipment on the machine to protect an operator within the compartment and the warnings to stay within the compartment while operating the forklift appear to actually discourage an operator from stepping off or jumping from the machine.
To Dr. Johnston's knowledge, Crown had done no actual testing or studies to determine whether it was safer to jump or stay with the machine or whether a properly designed door would actually impede the operator's easy ingress and egress. According to Dr. Johnston, if Crown's goal was to allow the operator a safe and quick exit, the opening in the enclosure should have been on the side of the compartment and not on the back across from the forks. In Dr. Johnston's opinion, the operator could not safely exit when the machine is falling in the same direction the operator is jumping, leaving few instances when the operator might be able to step off of the machine safely.
Based on the dynamics of a falling machine with a human operator and his experience in the fields of safety engineering and machine design and safety engineering, Dr. Johnson saw no advantage of leaving the door open in case the operator decided to jump. According to Dr. Johnston, in a forklift accident or with a falling machine, containment is preferable and provides a greater degree of safety to an operator in the majority of accidents. A door would protect the operator from the most common types of warehouse accidents; collisions and intrusions or penetrations by an object into the doorless compartment.
*939 Dr. Johnston testified that the proper procedure in safety design required Crown to test to determine the effect of doors on operator safety and whether a properly designed door would legitimately inhibit easy egress and ingress before Crown decided not to offer the door as an option. This was true especially in light of the action of Crown's competitors, Yale and Raymond, who offered doors to their customers for additional operator safety. Dr. Johnston believed that, at a minimum, a manufacturer like Crown should have made information on the option of a door and its effect available to its customers. On cross examination, Dr. Johnson admitted that he also had not done a hazard analysis on the specific product.
Dr. Johnston concluded that the design adopted by Crown of a doorless forklift does little to protect the operator from the most common accidents in a warehouse environment. In his opinion, the absence of a door does not create a safer environment for the operator, the accident in Mr. Hopper's case was a foreseeable type of accident, especially in a warehouse setting, and the injury to Mr. Hopper would not have occurred if the forklift had been equipped with a door.
Dr. Donald Peck Leslie, a physician accepted by the court as an expert in internal medicine and rehabilitation, testified that generally it is better to stay within the protection of a machine and that if the driver stays within the machine, the injuries are less severe. In Dr. Leslie's opinion, the impact of Mr. Hopper's body with the door or enclosure and the extension of his upper body over the door or enclosure would not cause the type of injuries suffered by Mr. Hopper or necessarily any type of severe injury, especially if the door was properly designed. On cross examination, Dr. Leslie testified that some type of serious injury, such as a hip or pelvic fracture was possible upon impact with a door, or with the enclosure presently on the forklift, but not the type of injury suffered by Mr. Hopper, paraplegia.
On the issue of design safety, Crown presented experts and various Crown employees involved in the design process and safety concerns.
Harold J. Stamen, the manager of the new product design division of Crown's engineering department, testified that in the late 1960's and 1970's, he was involved in the design of stand up forklifts and that an outside industrial design firm, Richardson/Smith, assisted in the design. The stand up forklift was designed primarily for warehouse usage. In designing the stand up forklift, a decision was made to enclose partially the operator compartment to provide the operator with something to lean against and to have an opening to the back of the machine opposite the forks, rather than a side opening. The back opening, in conjunction with a tilted floor, better secured the operator in the compartment than machines with openings on the left and right sides of the machine. This side stance, with the operator leaning against one side wall of the partial enclosure, afforded the operator better visibility forward and backward.
Mr. Stamen testified that, based on industry standards in the late 60's, one of which recommended no full enclosures as standard equipment and one which required easy egress and ingress, the decision was made not to fully enclose the compartment with a door. The stand up forklifts, including the RR series developed in the early 70"s, were field tested to see how they would operate. However, no specific testing on collisions or operator restraints was done by Crown. The RR series was getting ready for market by 1979.
Mr. Danny Lee Dunlap, an engineer, was hired by Crown in 1979 as a designer. The court accepted Mr. Dunlap as an expert in mechanical engineering and forklift design. Mr. Dunlap worked on the RR series forklift and testified that the RR forklift went into production in late 1979. When he was promoted to manager of product engineering, part of his duties were to accumulate accident data. This data was collected through the use of accident report forms formulated by Crown and distributed to dealers, Crown branches, and sales personnel. Mr. Dunlap testified that reports were analyzed and could be used as a basis for suggested design changes.
*940 Dock offs, tip overs, foot outs, ejections, and intrusions were the types of accidents reported. For the reports, dock offs were defined as accidents in which a forklift goes off of an elevated platform or dock. Dock offs occur for a variety of reasons, including an operator's obstructed view or a trailer pulling away from the dock before the forklift has disengaged. Tip overs were defined as a forklift that "goes over the center of gravity and falls over." A foot out occurred when the operator was injured because his foot was outside of the compartment. An ejection occurred when the forklift collided with something, came to an abrupt stop, and the driver was ejected. An intrusion involved a penetration by an object into the compartment. After a review of the reported accidents, Mr. Dunlap found that the injuries experienced in tip overs and dock offs were far more serious when the operator stayed with the machine and injuries in reported ejections were minor, such as bruised shoulders.
On cross-examination, answers by Mr. Dunlap pointed out the randomness of the reporting of the accidents, the fact that Crown admitted that many customers refused to report accidents to Crown, the instructions to the reporter to be careful what was recorded because it could be used in litigation, and the ambiguity of the reports, which made it hard and sometimes impossible to tell whether the operator jumped off of the machine or not.
The plaintiff's expert, Mr. Sevart, after reviewing the Crown accident reports, found a lower number of safe or minor injury jumping off incidents than reported by Crown in exhibits introduced at trial. The ambiguity or lack of sufficient information in the reports apparently led to the different interpretations. The accident reports in the record cover only forklifts without doors and include no reports of accidents with doors.
From 1985 to 1987, Mr. Dunlap worked on and developed a door. The door was added to a stand up forklift and driven around to see how it would work. Mr. Dunlap testified that, in evaluating the door, he noticed that the door slowed down the time the operator needed to get out of the machine, but no specific testing on time delay was done.
At the time of the accident in 1986, Crown decided not to offer a door as standard equipment. As a basis for the decision, Mr. Dunlap cited the accident reports, the industry standards and safety publications that did not recommend doors, the decision by Crown's competitors not to offer doors as standard equipment, and the slower egress and ingress times with a door. Crown was aware that the door could help prevent certain categories of accidents, such as ejections and penetrations, but was afraid of the possibility of the operator impacting with the door in a collision and being injured when the operator folded over the door at the waist. Mr. Dunlap also believed that the time delay caused by the door would be too great to allow easy egress from the machine and that the door would then trap an operator in the machine and increase the risk of accident in dock off and tip over types of accidents.
Mr. Dunlap testified that, although Crown did not promote or advertise a door as an option for a warehouse environment, Crown did manufacture and install doors at the request of its larger customers, including Ford, Chrysler, and K-Mart.
Mr. Dunlap presented a video, prepared by Crown after the accident, demonstrating various types of dock off and tip over accidents. Mr. Dunlap testified that the video was done to review the dynamics of these types of accidents, see how fast the machine falls, and how it rotates in the fall. Mr. Dunlap was not sure how fast the machine fell and no specific test results were submitted.
On cross examination, Mr. Dunlap testified that neither Crown, nor its competitors, included specific warnings to jump in case of a dock off or tip over in instruction manuals. In Mr. Dunlap's view, too many variables affected the decision to jump to include that instruction in a manual. Crown did not warn about the specific dangers of dock offs and tip overs. Also during cross examination by plaintiff, Mr. Dunlap admitted that Crown had not done specific testing to determine the effect of a collision on the operator within an enclosure with a door, that Crown did not *941 specifically test to determine the time delay created by a door, and that in the right environment a "door does provide more protection than hazard" and can be used safely.
Mr. Lynwood C. Root, an engineer, was qualified as an expert in the fields of forklifts, research and development engineering, and specification writing for forklifts. Mr. Root, before his retirement in 1990, was employed by the United States Army at the Belvoir Research Development and Engineering Command at Fort Belvoir, Virginia. Mr. Root participated in writing the specifications for material handling equipment, including stand up forklifts, and controlled the use of these types of equipment. Mr. Root during his employment was a member of the ASME/ANSI B56.1 sub-committee. Mr. Root followed the recommendations of the B56.1 sub-committee in writing the specifications for the Army. Mr. Root testified that the Army considered doors unsafe and did not use forklifts with doors because the door would not allow quick egress. When Mr. Sevart proposed to the B56.1 sub-committee that doors be added as standard equipment on stand up forklifts, Mr. Root voted against the proposal because of the slower egress, the ASME/ANSI standards requiring easy egress and ingress, and talks with users in the field who wanted a quick exit from the machine.
Mr. Frank Entwisle, an engineer with a degree in engineering mechanics, was accepted by the court as an expert in the fields of analysis of lift truck safety design, operator restraints for forklifts, operations and safety of forklifts, and human factors relating to the use of forklifts. In the 1980's, while employed by a Crown competitor, Clark Equipment Company, Mr. Entwisle participated in a study of the use of doors on stand up forklifts to determine if a net benefit would result from their use. Mr. Entwisle did an evaluation of mock up doors on Clark forklifts and reviewed evaluations by his own engineers and marketing group of the mock up doors. Mr. Entwisle concluded that no net benefit resulted from the inclusion of doors as standard equipment because the utility of the machine would decrease and the hazards to the operator would increase because the door would impede a quick exit from the machine.
Mr. Entwisle testified that, in his opinion, the forklift is not unreasonably dangerous as designed without a door. Mr. Entwisle based his opinion on the accident reports made to Clark, his evaluation of a mock up door, and the evaluation of other Clark departments.
While at Clark, Mr. Entwisle conducted a multi discipline study on operator restraints for sit down forklifts, a different design than the stand up forklift. The study included computer models of the effect of restraints and the extensive testing of candidate restraint devices. After the study, Clark agreed to retro fit any sit down forklift with restraints. Mr. Entwisle testified that it was deemed unnecessary to do such a study for stand up forklifts. The evaluations and opinions gathered by Mr. Entwisle were considered sufficient.
On cross examination, Mr. Entwisle testified that the RR series forklift was intended for use on smooth surfaces and for narrow aisle handling and storage of materials and that the use of doors would help prevent certain types of accidents, such as penetrations and foot injuries that occur when a foot is exposed outside of the compartment. Although no study had been done on stand up forklifts to determine the actual fall or tip over time or the time the operator has to make a decision to jump, Mr. Entwisle believed that the dynamics and fall times determined in the sit down forklift study would be the same for the stand up forklift.
Mr. Entwisle testified that several manufacturers offered and installed doors, but the number of machines with doors was only a small percentage of the stand up forklifts in the market. In answer to a question on cross examination about the number of accidents reported involving forklifts with doors, Mr. Entwisle testified that he had not seen a report of an accident on a forklift with a door, but he was not surprised because of the small number of machines with doors in use.
Dr. James V. Benedict, a physician and consultant in accident reconstruction, was accepted by the court as an expert in the area *942 of biomechanics, occupant kinematics, injury mechanisms, and injury causation. Dr. Benedict reviewed the demonstration video of dock off and tip over type accidents that was produced by Crown with Dr. Benedict's help. Dr. Benedict discussed the video results with Mr. Dunlap, analyzed the dynamics of these types of accidents and the possible effects on an operator, and prepared several drawings to illustrate his conclusions. Dr. Benedict asserted that the operator forced to stay with the machine in a tip over or dock off, because of the presence of a door, would be severely injured in most cases and that the door would not prevent certain types of intrusions that occurred at an odd angle or above the area of the side enclosure and door. Dr. Benedict testified that the forces from the fall on the operator in the compartment would make it difficult for the operator to hold on and brace for the fall. Dr. Benedict believed that the operator would be severely injured within the compartment or injured when the operator's head or upper body, because of the whipping action of the head caused by forces created by the fall, impacted with the floor or an outside object. In Dr. Benedict's opinion, the door reduced the time the operator had to exit safely from the machine and the time to jump is limited. However, Dr. Benedict did not know how much of a time delay a door would actually cause. Dr. Benedict did not conduct studies with people or dummies in the machine and did not believe that such a study was necessary.
In Dr. Benedict's opinion, a door would not have prevented the injury to Mr. Hopper. Dr. Benedict testified that Mr. Hopper's upper body would have been folded over the enclosure by the forces from the collision and exposed beyond the protection of the overhead guard. Dr. Benedict opined that while Mr. Hopper was beyond the overhead guard, he was exposed to the risk of concrete blocks or a beam falling on his back or neck and would have received injuries similar to the ones he in fact suffered or worse. Dr. Benedict based his opinion on his study of photographs of the accident scene and information given to him about the accident.
Crown's experts submitted two publications by industry groups, composed generally of government agencies, industry, consumer, and labor representatives, and insurance companies, and cited 29 CFR § 1910.178, the federal regulation promulgated by the Occupational Safety and Health Administration (OSHA). Although these sources did not prohibit doors, they did not recommend doors as standard equipment on the stand up type forklift. The Accident Prevention Manual for Industrial Operations, 8th edition, published by the National Safety Council and copyrighted in 1980, "recommended there be no operator enclosure." The Safety Standard for Low Lift and High Lift Trucks, 1983 edition with a 1984 copyright date, published by ASME in association with the ANSI B56.1 sub-committee, provided that "enclosures may be provided" and "shall permit easy ingress and egress from the platform." OSHA adopted the 1969 ANSI standards that did not recommend enclosures of any kind, unless provided with a platform. In such a case, the enclosures were to permit easy egress and ingress.
The booklet provided with the 45RR forklift is entitled You and Your Crown Narrow Aisle Stand-up Rider. On the inside of the front cover, in bold print, Crown warns the operator to "[p]rotect yourself by keeping your head, arms, hands and legs within the running lines of the truck." In its general safety instructions, Crown makes the following excerpted statements:
2. Operate only from designated operator's station. Keep inside the body of the truck. Keep away from the lifting mechanism. Keep hands on designated grips.
3. Use extreme care when operating where there is a risk of falling objects. This high lift rider truck should be equipped with an overhead guard and load backrest extension where the type of load presents a hazard.
10. Watch out for obstructions, especially overhead. Check clearances.
14. For additional user information, see pages 14 thru 16 of this manual and refer to the American National Standards ANSI B56.1.
*943 Between pages 14 to 16, in section E, entitled "Protect Yourself," Crown warns the operator to watch out for overhead obstructions and to keep the operator's "arms, hands, and legs away from the lifting mechanism and within the running lines of the truck." No where in the booklet does Crown warn about usage of the forklift in a dock area or of the specific dangers of dock-offs, tip overs, or collisions. Nor does the booklet suggest what evasive action should be taken in case of such accidents. The booklet says nothing about jumping out of the forklift or advising the operator to step out of the truck in the event of a pending dock-off or tip over.

ACTION OF THE TRIAL COURT
The trial court reviewed the testimony and evidence submitted by both sides, especially that of the many expert witnesses. The trial court chose to believe plaintiff's experts and relied heavily on the computer study and analysis done by Dr. Richard McLay. The trial court found that the plaintiff met his burden of proof under Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La. 1986),[1] and proved that the condition of the product was unreasonably dangerous because an alternative design that would produce less harmful consequences was available and the alternative design would have prevented the plaintiff's injuries. The trial court did not believe Crown's experts that a door would impede the egress from the forklift to such an extent that the door would create more danger or cause more serious injuries. The trial court accepted the testimony of plaintiff's experts that a door would not increase risk because it was almost always safer, even in dock offs and tip overs, to stay within the compartment. The trial court noted the lack of actual test results from Crown or their experts to support their opinions that jumping from the forklift in an emergency was safer, that a properly designed door would greatly impede egress, or support their opinions of the types of injuries that would occur if the driver stayed with the machine. It is evident from these findings, although not specifically stated, that the trial court found Crown's conduct, the refusal to adopt the optional design, unreasonable.
The trial court accepted the plaintiff's experts' testimony and found that, if the forklift was equipped with a door, the possible injuries resulting from the collision would not have been the severe injury that plaintiff suffered as a result of the ejection. Therefore, the forklift was unreasonably dangerous without a door and the absence of the door was the proximate cause of the injuries sustained by Mr. Hopper.
The trial court allocated 10% of the fault to Mr. Hopper, finding that Mr. Hopper could have reduced the risk or seriousness of the accident by driving through the warehouse doorway at a slower speed, 10% of the fault to Boyce, the seller of the forklift, because Boyce should have better assessed the needs of Associated Grocers and advised AG of the need for more clearance with the Crown forklift, and 80% of the fault to Crown. The trial court awarded the following amounts:

Past wages $ 159,394
Future wages $ 357,518
Physical pain and suffering $ 1,000,000
Mental pain and suffering $ 1,000,000
Past medical expenses $403,514.32
Life Care Plan $ 1,433,084
Permanent disability $ 500,000
Disfigurement $ 500,000

On June 24, 1993, the trial court rendered judgment in favor of Kevin Hopper and against Crown, reduced the total of the amounts awarded, $5,353,510.32, by 20%, resulting in an award to the plaintiff of $4,282,808.25.[2]
*944 Crown appealed and made several assignments of error to the trial court's analysis and findings on the condition of the product as unreasonably dangerous, on the foreseeability and severity of the injuries resulting from the condition of the product, on comparative fault of the parties, and on the amount of the general damages.

APPLICABLE LAW
"In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control." Halphen, 484 So.2d at 113. "Normal use is a term of art which includes all intended uses, as well as all foreseeable uses and misuses, of the product." Ingram v. Caterpillar Machinery Corp., 535 So.2d 723, 729 (La.1988). "Although a product is not unreasonably dangerous per se or flawed by a construction defect, it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about a danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product which is not within the knowledge of or obvious to the ordinary user." Halphen, 484 So.2d at 114-15. A product may be unreasonably dangerous because, "[a]lthough the utility of the product outweighs its danger-in-fact,[3] there was a feasible way to design the product with less harmful consequences." Halphen, 484 So.2d at 115 (footnote added). In performing the manufacturer's duty to warn or to adopt an alternative design, the "manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. A manufacturer also has a duty to test and inspect its product, and the extent of the research and experiment must be commensurate with the dangers involved." Halphen, 484 So.2d at 115 (citations omitted). Under either theory, the failure to warn or failure to adopt an alternative design, "evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty." Id. If the plaintiff "seeks to prove his case by impugning the manufacturer's conduct, e.g., by contending that the manufacturer failed to warn or to adopt feasible alternative designs, in fairness the manufacturer should be permitted to introduce evidence and present argument as to the standard of knowledge and conduct by which its conduct is to be judged." Halphen, 484 So.2d at 118.

ANALYSIS AND CONCLUSION
To decide the main issue in this case, we need to determine whether the trial court erred in finding that the plaintiff met his burden under the principles announced in Halphen. Our decision is based on the record presented by the parties and does not require that we determine whether, under all circumstances and in all work environments, Crown must include a door as standard *945 equipment on all 45RR series forklifts. See Hopper v. Crown, 558 So.2d 1117, 1117 n. 1 (J. Lemmon, concurring) (La.1990). We need determine only whether the trial court committed manifest error in finding that the harm was caused by the condition of the product and that the condition made the product unreasonably dangerous to normal use because Crown failed in its duty to adopt an alternative design that would produce less harmful consequences or failed in its duty to warn or to instruct.
We do not agree with Crown's position that the trial court misapplied the Halphen standard of proof or impermissibly shifted the burden of proof by not requiring the plaintiff to "impugn" Crown's conduct. Under Halphen, the plaintiff who "seeks to prove his case by impugning the manufacturer's conduct," does so by "contending that the manufacturer failed to warn or to adopt feasible alternative design...." Halphen, 484 So.2d at 118. Mr. Hopper adequately alleged such behavior in his petition and submitted competent evidence at trial, much of it accepted by the trial court, to impugn or call into question Crown's conduct in refusing to adopt an alternative safer design or to warn of the danger of using a doorless forklift in a warehouse environment.
The testimony of the expert witnesses differed greatly and it was "the responsibility of the trier of fact to determine which evidence [was] the most credible." Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106, 1111 (La.1990). Even in cases "where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
Crown designed the 45RR forklift for specialized use in a warehouse, but did not warn of the dangers of using the forklift for dock loading. Prior to and in 1986, Crown manufactured and installed a door at the request of large commercial customers who used the forklift in a warehouse environment and Crown knew that its competitors offered a door to their customers as a safety option. Crown's employee, Mr. Dunlap, agreed that in a warehouse environment a door can be used safely and may offer the operator more protection. Crown, however, in spite of these facts, chose not to advertise or offer the door option to any of its customers.
The trial court noted the lack of specific testing by Crown and relied on the opinions of plaintiff's experts who testified that the operator would not be placed in greater danger by the installation of a door, that a door would increase the safety of the operator in the types of accidents that most often occur in warehouses, and that generally an operator was safer bracing and staying with the machine, rather than jumping out in all types of accidents. Plaintiff's expert pointed out that, although Crown asserted that the door would create more harmful consequences because of the need to jump in dock offs and tip overs, Crown did not warn of such dangers or advise operators of what Crown believed to be the best course of action.
Plaintiff's experts opined that proper testing by Crown, a duty imposed by Halphen, would have demonstrated that the installation of a door does not increase the risk to the operator, even in dock offs and tip overs, and does increase the operator's safety in common warehouse accidents.
The trial court accepted the plaintiff's experts' conclusions that the 45RR forklift was unreasonably dangerous without a door and that collisions and the danger of objects falling from overhead in a warehouse setting are foreseeable.
The plaintiff's experts, unlike the expert in Ingram, did possess the experience and the academic qualifications necessary to express valid opinions in the fields of forklift design and safety, forklift accidents, injuries, and restraints and provided analytical and computer study results to use as a basis for the opinions. Compare Ingram, 535 So.2d at 728.
Crown argues that, in spite of plaintiff's experts' testimony, a door was not a safer alternative design and that its choice not to offer or install a door was not unreasonable.
Halphen allows the manufacturer in an alternative design or warning case, held to the standard of an expert, to "introduce evidence and present argument as to the standard of knowledge and conduct by which its *946 conduct is to be judged." Halphen, 484 So.2d at 118. Crown can introduce evidence that it could not have known of or feasibly avoided the danger. Id. However, Crown's evidence did not support such a claim.
Crown installed doors for its larger customers, knew that its competitors offered doors to their warehouse customers as safety options, and admitted that forklifts with doors could be a safer usage in warehouse environments.
Crown relied on industry standards and its interpretations of accident reports as a basis for not providing doors. However, the industry standards did not prohibit doors, did not address specific uses or work environments, offered minimum standards, and are not sufficient to meet the duty imposed by Halphen on a manufacturer, held to the standard of an expert, to test, inspect, research and experiment in a manner commensurate with the danger. Compliance with industry regulations does not excuse unreasonable behavior. Southern Natural Gas Company v. Gulf Oil Corporation, 320 So.2d 917, 920 (La.App. 3d Cir.1975), writ denied, 324 So.2d 812 (La.1976); see also Corley v. Gene Allen Air Services, Inc., 425 So.2d 781, 784 (La.App. 3d Cir.1982). On cross examination, the accuracy and reliability of the accident reports was seriously called into question, severely limiting their use as a basis for a design decision.
Crown's main argument for not offering doors to warehouse customers was that the forklift was sometimes used on docks, even though it was not developed for that specific use, and that the door would impede the operator's exit from the forklift and increase the risk of injury in dock off and tip over accidents. However, Crown did not do computer model studies or test a forklift with a door under the conditions experienced by the operator.
The trial court concluded that dock offs were dangerous to the operator with or without a door on the compartment, a finding supported by Crown's own demonstration video. However, the trial court found that the door would prevent other types of injuries and not create a greater risk for the operator. In a work environment like Mr. Hopper's, where the forklift is used in a warehouse and not for dock loading, the chances of a dock off type of accident is greatly reduced, if not eliminated.
Throughout the case Crown maintained that operators who jump are less severely injured in most dock offs and tip overs. In spite of this claim, Crown chose not to warn its users of the procedures that Crown believed operators should employ in these types of accidents. The instruction booklet does not explain or warn against the dangers of dock offs or tip overs or mention the advantages claimed by Crown of jumping from the machine. Indeed, the instructions and warnings given in the booklet, as noted by one of plaintiff's experts, infer that staying within the compartment is always preferred.
After a thorough review of the record, we find no manifest error in the trial court's finding that the harm resulted from the condition of the product and that the condition made the product unreasonably dangerous. Based on the record, the product was unreasonably dangerous because Crown failed to adopt an alternative feasible design with less harmful consequences for users in a warehouse setting where dock loading was not done by the stand up forklifts, the same work environment in which the plaintiff operated. At a minimum, Crown unreasonably failed to warn its customers on the dangers of dock loading, to instruct them on the safety advantages of a door in a particularized work environment, a warehouse setting, and to offer a properly designed door, one meeting the ANSI standards for easy egress and ingress, to a customer who used the forklift in just such a setting. Crown also breached its duty to test and experiment commensurate with the danger.

CAUSE OF THE INJURIES
We find no manifest error in the trial court's finding that the condition of the product caused the specific injuries to Mr. Hopper. Halphen does not require a finding that the condition of the product caused the accident. Halphen requires only that the plaintiff show that the condition of the product *947 caused the harm; the injury. Halphen, 484 So.2d at 113.
It is not necessary to conduct a crashworthy or enhanced injury type of analysis to determine the extent of the injuries caused by the unreasonably dangerous condition as opposed to the injuries that Mr. Hopper might have experienced if he had stayed within the compartment. Obviously, the trial court did not agree with Crown's assertion in brief that it introduced sufficient evidence to rebut the opinions of plaintiff's experts or to support Crown's theory that Mr. Hopper would have been severely injured in a forklift with a door by impacting the door or a finding that the impact would have caused a particular injury. The evidence apparently accepted by the trial court was that Mr. Hopper, who was thrown several feet from the forklift and hit in the back and neck, could not have been hit by the concrete beam or large concrete blocks and rendered a paraplegic, if the forklift had been equipped with a door. We find no manifest error in this finding. The few feet of Mr. Hopper's upper body that would be exposed beyond the overhead guard upon impact with the enclosure, was not in the path of the beam or large blocks of concrete. Plaintiff's experts testified that, if Mr. Hopper had remained in the compartment, any possible injuries upon impact with the side enclosures or door would have been minor in comparison and not of the type suffered by Mr. Hopper.
Contrary to the claims of Crown in brief, the record does not support a finding that large blocks of concrete were found in the compartment or that another concrete beam hit nearby, thus illustrating that large blocks could have hit Mr. Hopper within the compartment or within a few feet of the machine. The beam and large blocks that caused the injuries hit Mr. Hopper in areas of his body that were lying several feet from the forklift. No one witnessed the accident, but Mr. Frederick Wisbar, who arrived at the accident scene within minutes, testified that "some smaller stuff" was found in the compartment, but "nothing big." Mr. Wisbar testified that the injury causing debris lifted off of Mr. Hopper was about five to seven feet away from the forklift.

FORESEEABILITY OF THE INJURIES
Crown argues that this accident was a freak, and, therefore, unforeseeable accident and that such severe injuries from a collision are unforeseeable. We disagree.
From the record, it is apparent that collisions in a warehouse setting and ejections are foreseeable. It is foreseeable that a plaintiff ejected from a forklift used in a warehouse may be thrown to the floor and hit by heavy pallets or materials falling from the material handling forks or from warehouse stacks. The injuries from such an accident could easily include paraplegia or even death. The fact that a concrete beam and concrete blocks fell on Mr. Hopper does not change the foreseeability of this accident or render the injuries suffered by Mr. Hopper unforeseeable, especially in a warehouse where overhead doors separated sections of the warehouse and only a one inch clearance existed between the overhead doors and the top of the mast. Certainly, the forklift was being operated within normal usage at the time of the accident.

COMPARATIVE FAULT
The court, in determining the apportionment of fault, should consider the conduct of the tortfeasor and the causal relationship between the conduct and the harm. The court should consider whether the conduct involved an awareness of the danger or was inadvertent, how great was the risk created, what was the significance of the conduct, the capacities of the actors, and the extenuating circumstances. Ingram, 535 So.2d at 730.
After a review of all the factors, especially the duties and risk creating acts of the parties, we cannot say that the trial court erred in apportioning 80% of the fault to Crown. Under Halphen, Crown is held to the standard of an expert, with a duty to adopt a less harmful alternative feasible design and a duty to test, research, and experiment in a manner commensurate with the risks involved. Crown breached its duties to Mr. Hopper and created a risk of harm to users of the product in a warehouse environment *948 such as Mr. Hopper's. Boyce, as a seller who was not advised of the optional door or its advantages or disadvantages, did not have the knowledge or same high duty. We find nothing in the record to support increasing the allocation of fault to the plaintiff.

QUANTUM
On the issue of general damages, "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages. Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Prior to the accident, Mr. Hopper was a healthy and hard working individual with a new bride and the chance of a bright future. After the accident, Mr. Hopper was rendered a paraplegic, with severe medical and emotional problems, suffered the attempted suicide of his wife and the end of his marriage, and could expect to have difficulty maintaining job success or satisfaction and difficulty medically and emotionally in the future.
The trial court awarded Mr. Hopper $1,000,000 in physical pain and suffering, $1,000,000 in mental pain and suffering, $500,000 for permanent disability, and $500,000 for disfigurement. After a thorough review of the record, we cannot say that the trial court abused its "vast" discretion and that these awards, though generous, are "`so gross as to be contrary to right reason.'" Youn, 623 So.2d at 1261; see Bernard v. Royal Ins. Co., 586 So.2d 607, 617-19 (La.App. 4th Cir.), writ denied, 589 So.2d 1058 (La.1991).
For these reasons, we affirm the judgment of the trial court rendered June 24, 1993 and assess the costs of the appeal to the defendants.
AFFIRMED.
NOTES
[1] The accident occurred before the effective date of the Louisiana Products Liability Act, LSA-R.S. 9:2800.51, et seq. Therefore, Halphen controls. Gilboy v. American Tobacco Co., 582 So.2d 1263, 1264-65 (La.1991).
[2] It appears from the record that a second alternative judgment was rendered to be used in case this court found that the 1987 amendment to Civil Code article 2324 applied to this case. It does not apply. The accident occurred on April 6, 1986, before article 2324 was amended. The amendment made a substantive change in the law and is applied prospectively only. See Gauthier v. O'Brien, 618 So.2d 825, 830-31 (La. 1993); Miley v. LA. Farm Bureau Cas. Ins. Co., 599 So.2d 791, 806 (La.App. 1st Cir.), writ denied, 604 So.2d 1313 (La.1992).
[3] Halphen adopted the risk-utility test, instead of the consumer expectation test, to determine whether a product is unreasonably dangerous per se. However, in a failure to adopt an alternative design case, it is conceded that the utility outweighs the danger-in-fact, seemingly making a risk-utility or consumer expectation analysis superfluous. Halphen, 484 So.2d at 114 n. 2; see also Thomas C. Galligan, Jr., The Louisiana Products Liability Act: Making Sense of It All, 49 La.L.Rev. 629, 658-59 & n. 169 (1989); John Kennedy, A Primer on the Louisiana Products Liability Act, 49 La.L.Rev. 565, 606-607 & n. 174 (1989).

Crown argues that consumer expectation, specifically the user information provided by Mr. Root, should be utilized to determine whether the product is unreasonably dangerous in this case alleging failure to adopt an alternative feasible design and used as a basis to judge the manufacturer's conduct.
Because the manufacturer is held to the standard and skill of an expert and it is unlikely the ordinary consumer would know if a feasible safer alternative design existed, it is unclear how evidence of consumer expectation would be employed. Based on this record, however, it is not necessary to reach the particular question. The cited information that could be construed as consumer expectation is a reference by Mr. Root to talks with users who wanted a quick exit. An generalized user preference for a quick exit, not necessarily a doorless exit, does not address the issue of whether a safer feasible alternative design was available or serve as a reasonable basis for Crown's conduct.